# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN SULLICK,<br>        Plaintiff,<br><br>v.<br><br>UNITED PET GROUP, INC., doing business as "MARINELAND," also known as "MARINELAND AQUARIUM PRODUCTS,"<br>TETRA HOLDINGS(US), INC., trading as "PERFECTO MANUFACTURING, INC.," NEWA TECNO INDUSTRIA, SRL, and WORLDWIDE AQUARIUM & PET CENTER,<br>        Defendants. | CIVIL ACTION<br><br><br><br>NO. 14-2950 |
| ALLSTATE INSURANCE COMPANY, as subrogee of BURTON JENKINS,<br>        Plaintiff,<br><br>v.<br><br>UNITED PET GROUP, INC., doing business as "MARINELAND," also known as "MARINELAND AQUARIUM PRODUCTS,"<br>TETRA HOLDINGS (US), INC., trading as "PERFECTO MANUFACTURING, INC.," WORLDWIDE AQUARIUM & PET CENTER, and<br>NEWA TECNO INDUSTRIA, SRL<br>        Defendants. | CIVIL ACTION<br><br><br><br>NO. 14-5162 |

**DuBois, J.**                                                              June 12, 2015

# M E M O R A N D U M

## I. INTRODUCTION

Plaintiff John Sullick ("plaintiff" or "Sullick") commenced this action against defendants United Pet Group, Inc. d/b/a Marineland a/k/a Marineland Aquarium Products ("UPG"), Tetra Holdings (US), Inc. t/a Perfecto Manufacturing, Inc., Worldwide Aquarium & Pet Center, and NEWA Tecno Industria, S.R.L. ("NEWA"), alleging breach of warranties, strict liability, and negligence under Pennsylvania law. Subsequently, UPG filed an Answer with Affirmative Defenses, in which it asserted six crossclaims against defendant NEWA.[1] The suit arises out of a fire at plaintiff's home, which was allegedly caused by a defective Marineland Stealth aquarium heater marketed, designed, manufactured, assembled, and distributed by defendants.

Presently before the Court is Defendant NEWA Tecno Industria, S.R.L.'s Motion to Dismiss Plaintiff's First Amended Complaint and Defendant United Pet Group, Inc.'s Crossclaims for Lack of Personal Jurisdiction. For the following reasons, the Court denies NEWA's Motion to Dismiss.

## II. BACKGROUND[2]

### A. The Parties

Plaintiff John Sullick is a resident of Pennsylvania. (Am. Compl. ¶ 1.) Defendant and crossclaimant UPG is a Delaware corporation with principal places of business in Cincinnati,

---

[1] UPG alleges that NEWA designed, manufactured, assembled, packaged, and sold to UPG the Marineland Stealth aquarium heater at issue, which UPG asserts was not fit for use as a submerged heater in an aquarium. (UPG Ans. & Aff. Def. & Crossclaims ¶ 26.) UPG's crossclaims against NEWA include: (1) contractual indemnity under the Distribution Agreement between UPG and NEWA; (2) common law indemnity; (3) breach of contract; (4) implied warranty of merchantability; (5) express warranty of merchantability; and (6) contribution.

[2] The following facts are undisputed, unless otherwise noted.

Ohio and Blacksburg, Virginia. (Am. Compl. ¶ 2; Guoli Decl. ¶ 11.) Between 1986 and the end of 2009, UPG distributed products manufactured by NEWA, including aquarium heaters, to retailers across the United States. (Guoli Decl. ¶ 11; UPG Resp., Ex. A, 25 (Distribution Agreement between NEWA and UPG).)

Defendant/crossclaim defendant NEWA is an Italian company with its office and principal place of business in Loreggia, Italy. (Guoli Decl. ¶ 4.) NEWA has never owned or maintained an office or any real property in Pennsylvania nor has it maintained employees, sales agents, or a sales force there. (*Id.* ¶¶ 6–7.) NEWA has never directly sold, shipped, marketed, or advertised its aquarium heaters in Pennsylvania, and it sells its products to distributors that are all located outside of Pennsylvania. (*Id.* ¶¶ 5, 8, 10.) It has never paid taxes or maintained a bank account in the state. (*Id.* ¶ 9.)

### B. Factual Background

According to plaintiff, at some time before August 25, 2012, he "became the owner of a Marineland Stealth aquarium, which included a Marineland Stealth aquarium heater," and which he subsequently used in his home. (Am. Compl. ¶¶ 18–19.) On or about August 25, 2012, the Marineland Stealth aquarium heater allegedly caught fire, in turn setting fire to plaintiff's residence and causing damage to plaintiff's real and personal property. (Am. Compl. ¶ 20.)

Defendant NEWA manufactures Marineland Stealth heaters, which it sells to U.S.-based distributors like UPG. (UPG Resp., Ex. A, 25.) UPG distributed NEWA's products, including its aquarium heaters, to retailers across the United States, including the nationwide retail pet supply chain stores Petco and Petsmart, until the relationship ended at the close of 2009. (UPG Resp., Ex. G, Hr'g Tr. 49:6–22.) Between 2007 and early 2010, Petco and Petsmart sold approximately

3

2,000 to 5,000 NEWA Stealth heaters each year in Pennsylvania alone.[3] (*Id.* at 49:23–50:8.) According to NEWA's Managing Director, Giacomo Guoli, NEWA was aware that UPG distributed NEWA's Stealth heaters to Petco and Petsmart in every U.S. state and that Petco and Petsmart were the largest distributors of NEWA's Stealth heaters in the U.S. market.[4] (Guoli Dep. Tr. 37:8–9, 37:16–19, 39:3–6, 65:2–8.)

NEWA and UPG also cooperated to maximize sales of NEWA aquarium heaters to Petco and Petsmart. For example, NEWA worked with UPG to create "private label products," including aquarium heaters, for Petco and Petsmart, meaning products that were marketed and sold under the Petco and Petsmart names. (Guoli Dep. Tr. 74:7–12, 74:17–23.) NEWA also performed the final assembly and formatting of the packaging for its aquarium heaters, which was submitted to Petco and Petsmart for their approval. (UPG Resp., Ex. G, Hr'g Tr. 59:1–10.) NEWA submitted all its products to Underwriters Laboratories, a U.S. safety testing and certification organization located in Chicago, for approval in order to meet Petco and Petsmart requirements. (*Id.* at 60:1–25.) NEWA further cooperated with UPG to manage quantities of product shipped, inventories, and pricing specifically for Petco and Petsmart orders and to assess what changes to the NEWA heater packaging would be acceptable to Petsmart. (UPG Resp., Ex. H, I, K, & L.)

---

[3] Petco and Petsmart both have a significant presence in Pennsylvania, with more than 75 stores in the state. (UPG Sur-Reply, Ex. 2, Hr'g Tr. 49:14–18.)

[4] Since ending its relationship with UPG at the end of 2009, NEWA has distributed its aquarium heaters through distributors such as Central Aquatics, which continue to sell these products to Petsmart and Petco. (UPG Resp., Ex. E, ¶ 8 (Aff. of Joseph Carley and Thomas Schmidt).)

### C. Procedural History

Sullick filed his Complaint in this Court on May 23, 2014, and amended his Complaint to add defendants on June 20, 2014. UPG filed its Answer, Affirmative Defenses, and Cross-Claims on July 29, 2014.

On September 8, 2014, UPG removed the case of *Allstate Ins. Co. a/s/o Burton Jenkins v. United Pet Group, Inc. et al.* (Civil Action No. 14-5162) from the Philadelphia County Court of Common Pleas to this Court. The *Allstate* case arises out of the same incident as the *Sullick* action. By Order dated January 29, 2015, the Court consolidated the *Allstate* and *Sullick* actions for purposes of discovery only.[5]

On December 17, 2014, NEWA filed its Motion to Dismiss for lack of personal jurisdiction. Both Sullick and UPG submitted briefing in opposition to NEWA's Motion to Dismiss. By stipulation approved by the Court on March 30, 2015, plaintiff Allstate and NEWA agreed to incorporate in the *Allstate* action NEWA's Motion to Dismiss and all related briefing from the *Sullick* action and that no further briefing would be submitted on the issue.

## III. LEGAL STANDARD

### A. Burden of Proof

When a jurisdictional challenge is raised by a defendant, "the burden falls upon the plaintiff to come forward with sufficient facts to establish that jurisdiction is proper." *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). When the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a

---

[5] The Court deferred ruling on whether the cases will be consolidated for trial until it conducts a preliminary pretrial conference.

*prima facie* case of personal jurisdiction,[6] and the court is "required to take all of plaintiff's factual allegations as true and to resolve all factual disputes in plaintiff's favor." *Kingsmill v. Roundo AB*, No. 12-3524, 2013 WL 3778351, at *5 (E.D. Pa. July 18, 2013) (citing *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009)). The plaintiff, however, may not rest solely on the pleadings to satisfy its burden of proof. *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992). Instead, "the plaintiff must present sworn affidavits or other evidence that demonstrates a *prima facie* case for the exercise of personal jurisdiction." *Trueposition, Inc. v. Sunon, Inc.*, No. 05-3023, 2006 WL 1686635, at *2 (E.D. Pa. June 14, 2006) (DuBois, J.) (citing *Mellon Bank*, 960 F.2d at 1223).

Once plaintiff has established sufficient contacts between defendant and the forum state, the burden shifts to defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 324 (3d Cir. 2007).

### B. Personal Jurisdiction

"Under Federal Rule of Civil Procedure 4(k), a District Court typically exercises personal jurisdiction according to the law of the state where it sits." *Id.* at 316. In Pennsylvania, the applicable jurisdictional statute provides that a Pennsylvania court may "exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment." *McCann v. Sandals Resort Int'l, Ltd.*, No. 14-2208, slip op. at 2 (E.D. Pa. Feb. 11, 2015) (citing 42 Pa. C.S.A. § 5322).

---

[6] "The plaintiff meets this burden and presents a *prima facie* case for the exercise of personal jurisdiction by establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (quoting *Provident Nat'l Bank v. California Fed. Sav. & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir. 1987)) (internal quotation marks omitted).

6

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. General jurisdiction is established when defendant's contacts with the forum state are so "constant and pervasive" as to render defendant "at home" in the state. *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014). Specific jurisdiction exists when the claim is related to and arises out of defendant's "minimum contacts" with the forum such that defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780, 2787–88 (2011). Once minimum contacts are established, jurisdiction may be exercised if the court determines that doing so would comport with "traditional notions of fair play and substantial justice." *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft, Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).

## IV. DISCUSSION

In this case, Sullick and UPG do not argue that NEWA has sufficient contacts with Pennsylvania to support general jurisdiction; the Court, therefore, considers only whether it has specific jurisdiction over NEWA. For the following reasons, the Court concludes that it may exercise specific jurisdiction over Sullick's claims and UPG's crossclaims against NEWA.

### A. Minimum Contacts

First, Sullick and UPG must demonstrate that NEWA has sufficient minimum contacts with Pennsylvania to show that NEWA "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Nicastro*, 131 S. Ct. at 2787–88; *D'Jamoos*, 566 F.3d at 102. UPG and Sullick contend that they have demonstrated that NEWA has sufficient minimum contacts with Pennsylvania based on a "stream of commerce" theory. Under this theory, specific jurisdiction may be

"asserted over a nonresident defendant which injected its goods, albeit indirectly, into the forum state and either derived a substantial benefit from the forum state or had a reasonable expectation of deriving a substantial benefit from it." *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 203 (3d Cir. 1998).

The Supreme Court addressed the "stream of commerce" theory in *Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 112 (1987), and presented "three different conceptions of purposeful availment through the stream of commerce." *Pennzoil Prods. Co.*, 149 F.3d at 203. Justice O'Connor, joined by three other Justices, concluded that the "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi*, 480 U.S. at 112. Rather, "[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum State" is required. *Id.* Such additional conduct may include, *inter alia*, "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.*

Justice Brennan, writing for another plurality of four Justices, rejected Justice O'Connor's "additional conduct" standard and concluded that the minimum contacts requirement is satisfied so long as there is a "regular and anticipated flow of [defendant's] products" into the forum and defendant "is aware that the final product is being marketed in the forum State." *Id.* at 117. Justice Stevens, the ninth vote, wrote that whether a defendant's conduct satisfies the minimum contacts test "is affected by the volume, the value, and the hazardous character of the components." *Id.* at 122.

The Third Circuit has not yet adopted the reasoning of Justice O'Connor's plurality or Justice Brennan's concurrence in *Asahi*.[7] *See D'Jamoos*, 566 F.3d at 105 n.15. However, courts in the Third Circuit generally apply both tests in determining whether the exercise of personal jurisdiction is proper.[8] *See, e.g.*, *H.A.S. Protection, Inc. v. Senju Metal Indus. Co., Ltd.*, No. 03-1215, 2003 WL 23419852, at *6 (E.D. Pa. Feb. 27, 2003) (citing *Pennzoil Prods. Co.*, 149 F.3d at 205). In this case, the Court concludes that Sullick and UPG have produced sufficient evidence to support a finding of purposeful availment under both tests.

With respect to Justice Brennan's concurrence, the Third Circuit has stated that the exercise of specific jurisdiction is proper where defendant was aware that its product would end up in the forum state and there was some regularity of shipment to that state. *Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 282 (3d Cir. 1994). The Court concludes that Sullick and UPG have demonstrated both that NEWA was aware that its products would end up in Pennsylvania and that there was a regular shipment of NEWA's aquarium heaters to the state.

First, NEWA's awareness that its aquarium heaters ended up in Pennsylvania is demonstrated by the deposition testimony of Managing Director, Giacomo Guoli, who affirmed that he knew that UPG sold NEWA's products to Petco and Petsmart in *every* U.S. state, without

---

[7] "The plurality opinion of Justice O'Connor and the concurrence of Justice Brennan are far more commonly relied upon, because Justice Stevens wrote only for himself on this specific issue." *Trueposition, Inc. v. Sunon, Inc.*, No. 05-3023, 2006 WL 1686635, at *9 (E.D. Pa. June 14, 2006). For that reason, the Court does not address Justice Stevens's concurrence in its analysis.

[8] The Supreme Court most recently addressed the stream-of-commerce theory of personal jurisdiction in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011). The Supreme Court, however, did not produce a majority opinion and did not clearly adopt one of the two *Asahi* standards. Therefore, this Court will continue with the approach of District Courts in the Third Circuit and determine whether Sullick and UPG have met their burden with respect to the two standards announced in *Asahi*. *See Sieg v. Sears Roebuck & Co.*, 855 F. Supp. 2d 320, 327 (M.D. Pa. 2012) (adopting the same approach).

exception.[9] (Guoli Dep. Tr. 64:22–65:8.) Courts have held that a defendant's knowledge that its products are shipped to buyers in the forum state through an established distribution channel supports the conclusion that defendant purposefully availed itself of the privilege of conducting business in that state. *See Negron v. Oxford Airport Technical Servs.*, No. 09-330, 2009 WL 1249288, at *5 (E.D. Pa. May 6, 2009) (concluding that exercise of jurisdiction was proper where defendant's officer testified that he knew that the company's products were sold to Northwest Airlines, that Northwest Airlines distributed the products to all of its airports, and that Northwest Airlines operated in Philadelphia), *recons. denied*, 2009 WL 1674421 (E.D. Pa. June 11, 2009); *Worldtronics In'l v. Ever Splendor Enter. Co.*, 969 F. Supp. 1136 (N.D. Ill. 1997) (holding that exercise of jurisdiction was proper where defendant was aware that its products were distributed through "an established distribution channel" that ended at national retail chains with store locations in the forum state).

Second, the fact that Petco and Petsmart have engaged in a steady sale of NEWA's aquarium heaters in Pennsylvania — selling between 2,000 and 5,000 units a year from 2007 through early 2010 — demonstrates that there has been a regular flow of NEWA heaters to Pennsylvania and further supports the conclusion that NEWA was aware that its products were marketed in the state. *See Trueposition*, 2006 WL 1686635 at *8 (concluding that defendant knew or reasonably should have known that its products were being sold in the forum state based on number of sales); *see also H.A.S. Protection, Inc.*, 2003 WL 23419852 at *6 (same). The regular sales of NEWA aquarium heaters in the state also demonstrates that NEWA "derived a

---

[9] The deposition transcript reads as follows: "Q: And just so the record is clear then… [NEWA] knows its products are being sold by UPG and now Aquarium Systems to the two largest retailers, Petco and Petsmart, in every state in the United States. Is that all true? A: Yes." (Guoli Dep. Tr. 64:22–65:8.)

substantial benefit from [Pennsylvania] or had a reasonable expectation of deriving a substantial benefit from [the state]," further supporting the exercise of specific jurisdiction over NEWA. *Pennzoil Prods Co.*, 149 F.3d at 203; *see also Asahi*, 480 U.S. at 117 (Brennan, J., concurring) (stating that the fact that defendant Asahi was aware of the distribution system's operation and that it would benefit economically from sales in California was sufficient to support a finding of minimum contacts). In light of Mr. Guoli's testimony and the steady sale of NEWA's aquarium heaters in Pennsylvania, the Court concludes that Sullick and UPG have established a *prima facie* showing that there was a "regular and anticipated flow" of NEWA aquarium heaters into Pennsylvania and that NEWA was "aware that the final products [were] being marketed in" Pennsylvania, thus satisfying Justice Brennan's test in *Asahi*. 480 U.S. at 117 (Brennan, J., concurring).

With respect to Justice O'Connor's plurality opinion, the Court concludes that NEWA's efforts to manufacture and market its aquarium heaters to the satisfaction of Petco and Petsmart, accompanied by its knowledge that these companies sold its products in Pennsylvania, demonstrates that NEWA engaged in "additional conduct" that "indicate[s] an intent or purpose to serve the market" in Pennsylvania. *Asahi*, 480 U.S. at 112. As discussed above, NEWA worked with UPG to create "private label products" for Petco and Petsmart that were specifically packaged and sold under the Petco and Petsmart names. (Guoli Dep. Tr. 74:13–23, 95:9–13.) NEWA also cooperated with UPG to design product packaging and to manage quantities of product shipped, inventories, and pricing for Petco and Petsmart orders of its products, including its aquarium heaters. (UPG Resp., Ex. H, I, K, & L.) Finally, NEWA submitted its aquarium heaters to Underwriters Laboratories for certification in order to meet Petco and Petsmart requirements. (UPG Resp., Ex. G., Hr'g Tr. 60:1–25.) As Mr. Guoli testified in his deposition,

11

NEWA took these actions because it did not "wish to cause any issues with Petco" since Petco was "a customer, an indirect customer, but still a customer." (Guoli Dep. Tr. 97:14–22.) This evidence demonstrates that NEWA was actively involved in targeting the markets in which Petco and Petsmart operated, which NEWA knew included Pennsylvania, and "designed its products in anticipation of sales" by these retailers in Pennsylvania, among other states. *Asahi*, 480 U.S. at 112 (citing *Rockwell Int'l Corp. v. Costruzioni Aeronautiche Giovanni Agusta*, 553 F. Supp. 328, 332 (E.D. Pa. 1982) (holding that the exercise of jurisdiction was reasonable where defendant customized its ball bearings "intend[ing] [them] to be an inseparable part of the [distributor's] marketing plan" throughout the United States)).

In sum, NEWA's contacts with Pennsylvania were not "random, fortuitous, or attenuated." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Instead, Sullick and UPG have presented evidence to demonstrate that there was a regular and anticipated flow of NEWA's aquarium heaters into Pennsylvania, that NEWA was aware its aquarium heaters were being marketed in Pennsylvania and that it would benefit economically from these sales, and that NEWA worked with UPG to customize its products for the markets that Petco and Petsmart served, which included Pennsylvania. For these reasons, the Court concludes that NEWA has the requisite minimum contacts to demonstrate that it purposefully availed itself of the benefits and privileges of conducting business in Pennsylvania, thus satisfying the requirements of due process.

### B. Arise Out Of/Relate To

Next UPG and Sullick must present evidence to show that the present "litigation [arose] out of or relate[s] to at least one of" NEWA's activities directed at the forum state. *D'Jamoos*, 566 F.3d at 102. The Third Circuit has held that this "relatedness" requirement is met if (1)

defendant's contact with the forum state is a "but for cause of the litigation," meaning that "plaintiff's claim would not have arisen in the absence of the defendant's contacts" and (2) "the burden of personal jurisdiction on the defendant is justified by the value of the benefit from the contact." *O'Connor*, 496 F.3d at 319, 322–23. "Although there is no specific rule susceptible to mechanical application in every case and the inquiry is necessarily fact-sensitive," the relatedness element of specific jurisdiction aims to ensure that a defendant's jurisdictional exposure is proportional to his contacts with the forum state and that personal jurisdiction is "reasonably foreseeable." *Renner v. Roundo AB*, No. 08-209, 2010 WL 3906242, at *4 (W.D. Pa. Sept. 29, 2010) (quoting *O'Connor*, 496 F.3d at 323) (internal quotation marks omitted).

NEWA contends that UPG and Sullick have not demonstrated that the litigation arises out of or relates to NEWA's contacts with Pennsylvania because they have not presented evidence that the Marineland Stealth aquarium heater in question "traveled to Pennsylvania in the regular stream of commerce" and that plaintiff subsequently purchased it in Pennsylvania. (NEWA Reply. 1–2.) For the following reasons, the Court rejects NEWA's argument.

To defeat a Rule 12(b)(2) motion, a plaintiff is only required to establish a *prima facie* case for personal jurisdiction, not to exclude all possible jurisdictional deficiencies. The plaintiff in a product liability suit is not required to produce evidence that shows how a product actually reached him. *Simons v. Arcan, Inc.*, No. 12-1493, 2013 WL 1285489, at *5 n.5 (E.D. Pa. Mar. 28, 2013). "Instead, [plaintiff] must produce evidence of a way that the product could have

reached him that is related to the defendant's purposefully directed conduct."[10] *Id*. Defendant may present evidence that, if true, would disprove relatedness, in which case plaintiff must rebut this evidence to meet his burden of proof. *Id.*

Sullick has "produce[d] evidence of a way that the [Marineland Stealth aquarium heater] could have reached him that is related to the defendant's purposefully directed conduct." *Id.* In particular, Sullick has produced evidence to demonstrate that NEWA exploited the market for its Marineland Stealth aquarium heaters in Pennsylvania through a defined distribution network, which resulted in the steady sale in Pennsylvania of the type of aquarium heater at issue in this case. The Court concludes that this evidence — demonstrating the regular flow of NEWA's Marineland Stealth aquarium heaters into Pennsylvania, along with NEWA's efforts to exploit the Pennsylvania market through relationships with retailers like Petco and Petsmart — is sufficient to support an inference that the aquarium heater at issue reached plaintiff in Pennsylvania through this "regular flow, as opposed to an unpredictable flow, of the stream-of-commerce." *Id.* at *6 (concluding that, to make a *prima case* of relatedness, it was sufficient for plaintiff to show that defendant had placed the product at issue into the stream of commerce and purposefully directed its activities at creating a market in Pennsylvania by selling to retailers with extensive operations in the state). As NEWA has not presented any evidence to the

---

[10] As the court in *Simons v. Arcan, Inc.*, noted, to require more at this stage would be to "require products liability plaintiffs to prove the chain of title for the product. This would place a tremendous burden on a plaintiff and the courts. Additionally, this requirement might encourage defendants to use jurisdictional discovery to discourage litigation by increasing a plaintiff's costs or encourage manufacturers to make specific products more difficult to identify." No. 12-1493, 2013 WL 1285489, at *6 n.7 (E.D. Pa. Mar. 28, 2013).

contrary,[11] the Court determines that sufficient evidence has been presented to demonstrate that the litigation would not have arisen in the absence of NEWA's efforts to place its Marineland Stealth aquarium heaters into the stream of commerce targeted at Pennsylvania.

"The second element of the relatedness prong is intended to ensure that 'the notion of a tacit *quid pro quo* that makes litigation in the forum reasonably foreseeable' is present." *Id.* (quoting *O'Connor*, 496 F.3d at 322). Here, NEWA received profits from the steady sale of its products to Pennsylvania retailers and consumers, and the Court concludes that "[t]he benefit of these profits is proportional to the burden of specific jurisdiction for injuries caused by the same products," thus satisfying the second element of the relatedness prong. *Id.*

For these reasons, the Court determines that UPG and Sullick have presented sufficient evidence to demonstrate that the present litigation arose out of or relates to at least one of NEWA's activities directed at Pennsylvania.

### C. Fair Play and Substantial Justice

Having found the requisite minimum contacts, the Court must consider whether the exercise of specific jurisdiction over NEWA comports with notions of "fair play and substantial justice." *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe Co.*, 326 U.S. at 316.) In "addressing the fairness question [courts] may consider 'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental social policies.'" *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2003) (quoting

---

[11] "If the defendant shows at a further point in the litigation that the plaintiff's disputed jurisdictional allegations are not true, the Court can then dismiss for lack of jurisdiction." *Id.* at *5 n.5.

*Burger King*, 471 U.S. at 477). The Court concludes that these factors weigh in favor of the Court's exercise of personal jurisdiction over NEWA.

First, Pennsylvania has a strong interest in adjudicating the dispute. States have "an especial interest in exercising … jurisdiction over those who [are alleged to have] commit[ted] torts within its territory because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection." *Merced v. Gemstar Grp., Inc.*, No. 10-3054, 2011 WL 5865964, at *5 (E.D. Pa. Nov. 22, 2011). Second, as a Pennsylvania resident, Sullick has a strong interest in litigating in a convenient, local forum. Further, it would be "inefficient for the court, burdensome to plaintiff and possibly unfair to the other defendants," *Negron*, 2009 WL 1249288 at *6, to require that claims against NEWA be pursued in a separate forum while litigation of the related claims continues in this District. The Court acknowledges the burden on defendant of litigating in a foreign court but concludes that "[i]t would be fundamentally unjust to allow a foreign corporation to reap the economic benefits of conducting business in this forum while leaving an injured plaintiff remediless." *Merced*, 2011 WL 5865964 at *5. Thus, the Court determines that the exercise of personal jurisdiction in this case comports with notions of fair play and substantial justice.

V. **CONCLUSION**

For the foregoing reasons, the Court will exercise specific jurisdiction over NEWA. NEWA's Motion to Dismiss Plaintiff's First Amended Complaint and Defendant United Pet Group, Inc.'s Crossclaims for Lack of Personal Jurisdiction is denied.

An appropriate order follows.